**DYNAMICS CORPORATION OF AMERICA, Plaintiff,**

v.

**INTERNATIONAL HARVESTER COMPANY, Defendant.**

**No. 74 Civ. 4501.**

United States District Court, S. D. New York.

March 18, 1977.

Cole & Groner, P. C., Washington, D. C., Abraham Rotwein, New York City, for plaintiff; Alan Y. Cole, William A. Kahn, Lee A. Schutzman, Washington, D. C., of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant; Ronald L. Engel, James M. Amend, Robert G. Krupka, Kirkland & Ellis, Chicago, Ill., of counsel.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff, Dynamics Corporation of America ("Dynamics") brought this action against International Harvester Company ("International") to recover damages for alleged breaches of a contract for the sale of trucks and for alleged fraudulent representations made by International to induce Dynamics to enter into that contract and to purchase International's truck manufacturing facilities in Bridgeport, Connecticut.[1] International counterclaims, alleging a cause of action for breach of contract.

The trial took eleven days, with the transcript of testimony totalling almost 2200 pages and with several hundred exhibits in evidence. Since the trial was to the Court,

---

1. Jurisdiction is grounded on diversity. 28 U.S.C. § 1332(a).

some testimony and a number of exhibits, which upon their face included hearsay matter or self-serving declarations or were of doubtful competency, were received with the observation that the Court's determination of the issues would be based only upon a consideration of proper evidence.[2] The trial, of course, afforded the Court the opportunity to appraise the demeanor of witnesses where their testimony was in conflict.

## I. FACTUAL BACKGROUND

Prior to 1966, International owned and operated, through one of its subsidiaries, a truck manufacturing plant in Bridgeport, Connecticut, which was referred to as the "Bridgeport Works" ("Works"). In April 1966 it began to operate the Works directly as a part of its Motor Truck Division. For a number of years International produced at the Works a new model line of steel-bodied, multi-stop delivery trucks called "Metros." The trucks were sold through International's marketing organization, which included various company-owned retail branches and independently owned retail dealerships.

In early 1968, International decided for various reasons, including operating losses and a decline in the market for Metros, to close the Works. On or about May 23, 1968, International publicly announced its decision; in early August 1968, all operations at the plant closed. About the time of the public announcement, Dynamics, which had no prior experience in the manufacturing or marketing of delivery trucks, manifested an interest in acquiring the Works. Negotiations between Dynamics and International for the sale of the Works ensued. During the course of bargaining, meetings of Dynamics and International representatives, sometimes attended by lawyers, took place in Bridgeport and Chicago. In addition, at Dynamics' request, its independent outside auditors, Alexander Grant Company ("Alexander Grant"), were permitted to visit the Works to observe its operation and to inspect its books and records. The negotiations extended from about the end of May until October 16, 1968, when the parties executed two documents that are the subject of this litigation, entitled "Purchase Agreement" and "Agreement." The "Purchase Agreement" (hereinafter "Works contract") set out the terms and conditions under which the land, buildings, manufacturing equipment and other assets constituting the Works would be transferred from International to Dynamics; the "Agreement" (hereinafter "Truck contract") obligated Dynamics to produce and sell, and International to purchase, specified minimum numbers of Metros over a three-year period.

In October 1968, Dynamics took possession of the Works, which then became its "Dyna-Truck Division" ("Dyna-Truck"), and began readying the plant for resumption of Metro production. Before actually commencing manufacturing operations, however, Dyna-Truck bid on and was awarded a contract under which it was to produce 6,961 special-order trucks for the United States Post Office ("Post Office contract"). In late January or early February of 1969, Dyna-Truck produced its first Metro and began to fulfill its obligations under the Truck contract. Simultaneously, Dyna-Truck made preparations for the production of vehicles for the Post Office, and by the latter part of 1969 these vehicles were being manufactured in quantity.

Dyna-Truck's operation of the Works was not, however, without its difficulties. The plant experienced numerous problems with production, labor, management, finances and customer goodwill, and in each of its first three years of operation under Dynamics it sustained annual losses ranging from $786,565 to $2,772,082. After being notified

2. See United States v. 1,291.83 Acres of Land, 411 F.2d 1081, 1086 (6th Cir. 1969); Reid v. Quebec Paper Sales & Transp. Co., 340 F.2d 34, 38 (2d Cir. 1965); United States v. 396 Corp., 264 F.2d 704, 709 (2d Cir.), cert. denied, 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959); New York Life Ins. Co. v. Harrington, 299 F.2d 803, 806 (9th Cir. 1962); Child v. Beame, 425 F.Supp. 194 (S.D.N.Y.1977); Allen & Co. v. Occidental Petroleum Corp., 382 F.Supp. 1052, 1054–55 (S.D.N.Y.1974), aff'd, 519 F.2d 788 (2d Cir. 1975).

by International that the Truck contract would not be renewed upon its expiration, Dynamics decided in late 1971 to sell the Dyna-Truck division. Production was discontinued in early 1972, but no purchaser for the facilities as a going concern could be located, and Dyna-Truck's assets were finally sold to a liquidator in 1973. At the time of this sale, Dynamics was undergoing an arrangement under Chapter XI of the Bankruptcy Act, as a result of which six of its nineteen divisions and subsidiaries were sold.

Dynamics filed the present action on October 15, 1974, only one day short of six years after the execution of the Truck and Works contracts. As noted, Dynamics seeks damages both for International's alleged breaches of the Truck contract and for International's alleged fraudulent representations and practices in inducing Dynamics to enter into the Works contract and Truck contract. These claims will be treated separately.

## II. CONTRACTUAL CLAIMS

### (a) Statute of Limitations.

In its complaint Dynamics alleges that International breached the Truck contract by failing: (1) to furnish Dynamics with technical information, specified in the agreement, which was to aid Dynamics in producing trucks; (2) to provide Dynamics with quarterly forecasts of International's truck requirements; (3) to make the minimum annual purchases of trucks called for by the agreement; (4) to place the requisite minimum numbers of monthly orders for trucks; and (5) to make diligent efforts to sell more than the minimum number of trucks required to be purchased from Dynamics under the contract.[3] Although International denied, and introduced evidence at trial intended to repel, these charges, it contends that the various claims are partly and in some instances wholly barred by the applicable statute of limitations. It asserts that the Truck contract upon which the claims are based is one "for the sale of goods" and is thus governed by the New York Uniform Commercial Code ("UCC"), which contains a four-year statute of limitations.[4]

Dynamics, to the contrary, argues that the New York six-year statute of limitations, applicable to actions based on general contractual obligations,[5] should govern its claims under the agreement for the sale of trucks to International. Dynamics contends that for purposes of applying a statute of limitations, the Works contract and the Truck contract must be read as a single contract. Accordingly, it urges that its agreement with International is not one primarily "for the sale of goods" and thus is not covered by the UCC[6] because the sale of the trucks was only incidental to the predominant purpose of selling the Bridgeport plant and the steel-bodied Metro business to Dynamics. Thus it emphasizes that an integral part of the sale of the Works to Dynamics obligated International to provide technical information as well as marketing services to assure smooth-running operations and distribution.

The issue whether separate documents executed simultaneously should be treated as a single contract is governed by the intent of the parties manifested at the

---

3. At the commencement of trial, Dynamics was allowed to amend its complaint by adding a claim that International, in violation of the Truck contract, sold Dynamics component parts for certain vehicles at prices greater than those charged to other manufacturers purchasing such parts from International. After presenting his case, counsel for Dynamics correctly conceded that insufficient evidence had been adduced in support of this claim, and it was accordingly abandoned.

4. U.C.C. § 2–725(1) (McKinney 1964). Both the Truck contract and the Works contract provide that they "shall be governed by and construed in accordance with the law of the State of New York," and there is no issue concerning the validity of this agreement. *See Haag v. Barnes,* 9 N.Y.2d 554, 216 N.Y.S.2d 65, 69, 175 N.E.2d 441 (1961); *Levey v. Saphier,* 83 Misc.2d 146, 370 N.Y.S.2d 808, 813 (Sup.Ct. 1975); *Tuition Plan, Inc. v. Zicari,* 70 Misc.2d 918, 335 N.Y.S.2d 95, 101 (Dist.Ct.1972).

5. N.Y.C.P.L.R. § 213(2) (McKinney 1972).

6. *See* U.C.C. §§ 2–102, 2–106 (McKinney 1964).

time of contracting and viewed in light of all the surrounding circumstances.[7] Clearly, Dynamics' purchase of the Works and International's agreement to purchase trucks were parts of a single underlying transaction. Dynamics, at the time a budding conglomerate, but without prior experience in truck manufacturing or marketing, desired to enter that field. International desired to dispose of its antiquated plant with its idle machinery and equipment. It is beyond peradventure that Dynamics would not have purchased the Works with its productive facilities unless International agreed to purchase trucks to assure the Works a demand for its production during the initial years of Dynamics' operations.[8] Similarly, International would never have agreed to buy trucks from Dynamics, an inexperienced newcomer to the field, unless Dynamics bought the Works. The Truck contract and the Works contract were thus contemporary documents that implemented a single coordinated transaction, albeit each dealt with a different subject matter. All the surrounding circumstances prior to and contemporaneous with the execution of the two documents leave no room to doubt that the parties intended that the documents constitute a single, indivisible contract and that their obligations under each be common and interdependent.[9] The fact that the parties executed separate documents, although evidential of a contrary intent, is not conclusive,[10] and loses much of its force in the instant case due to the undisputed testimony that tax considerations dictated the use of separate contracts. The Works contract and the Truck contract must therefore be read as one agreement for the purpose of applying a statute of limitations.

In determining whether a contract is for the sale of goods, and thus covered by the UCC, it is necessary to look to the "essence" or main objective of the parties' agreement.[11] If the provision of services or rendition of other performance predominates and is not merely incidental or collateral to the sale of goods, then the contract will not be subject to Article Two of the UCC with its four-year limitation.[12]

The evidence establishes that Dynamics' dominant objective in contracting was to acquire the Works, just as International's dominant objective was to divest itself of an asset that it had ceased to use. During the course of negotiations for the sale of the Works, it became apparent that Dynamics would be unable to operate its acquisition as a profitable enterprise unless it was assured of a minimum demand for

---

7. See *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972); *First Savings & Loan Ass'n v. American Home Assurance Co.,* 29 N.Y.2d 297, 327 N.Y.S.2d 609, 277 N.E.2d 638 (1971); 3A Corbin, Contracts § 696 & p. 290 (1960).

8. Indeed, Dynamics' obligations under the Works contract were expressly conditioned upon International executing the Truck contract.

9. See cases cited in note 7 *supra.*

10. See *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972); *Ripley v. International Rys. of Central America,* 8 N.Y.2d 430, 209 N.Y.S.2d 289, 171 N.E.2d 443 (1960); *Nau v. Vulcan Rail & Const. Co.,* 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941).

11. *North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 697 (2d Cir. 1972); *Curtis Publishing Co. v. Sheridan,* 53 F.R.D. 642, 643–44 (S.D.N.Y.1971); *Perlmutter v. Beth David Hosp.,* 308 N.Y. 100, 104, 123 N.E.2d 792, 794 (1954); *Joseph P. Suchy, Inc. v. Stuerzel,* 82 Misc.2d 40, 370 N.Y.S.2d 316, 317 (1st Dep't 1975); *Schenectady Steel Co. v. Bruno Trimpoli Gen. Const. Co.,* 43 A.D.2d 234, 350 N.Y.S.2d 920, 922 (3d Dep't), aff'd, 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974); *Ben Const. Co. v. Ventre,* 23 A.D.2d 44, 257 N.Y.S.2d 988, 989 (4th Dep't 1965); *Hargraves Mills v. Gordon,* 137 App.Div. 695, 122 N.Y.S. 245, 249 (1st Dep't 1910), aff'd mem., 203 N.Y. 568, 96 N.E. 1116 (1911). See also *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir. 1974); *Al Bryant, Inc. v. Hyman,* 17 U.C.C.Rep. 790, 793–94 (Pa.C.P.1975). Although some of the above-cited New York cases were decided under the N.Y. Sales Act, predecessor to the UCC, they are equally applicable in determining whether the UCC governs a particular contract. *North American Leisure Corp., supra,* 468 F.2d at 697 n. 3.

12. See cases cited in note 11 *supra.*

trucks in its first years of ownership. International thus agreed in the Truck contract to purchase annual minimum numbers of vehicles from Dynamics, to supply Dynamics with technical information concerning the production of such vehicles, to attempt to market more than the minimum numbers of Metros required to be purchased, and to render various other services to Dynamics in connection with the latter's operations. These obligations were incidental and collateral to the main object of effecting a transfer of the Works, and the parties' agreement, taken as a whole, cannot be characterized as being primarily for the sale of goods.[13]

Upon the totality of all evidence, the Court holds that the six-year statute of limitations contained in section 213 of the New York Civil Practice Law and Rules which is applicable to "an action upon a contractual obligation or liability" governs with respect to Dynamics' claims under the Truck contract. Since this action was filed prior to six years after the occurrence of the alleged breaches, Dynamics' contractual claims are not barred.

(b) Technical Information.

■ Dynamics charges that International breached its obligations under the Truck contract to furnish Dynamics with technical information concerning the production of Metros. The two paragraphs in the parties' agreement that deal with technical information provide:

[A](b) DCA agrees that specification trucks and M-800 trucks shall, in all respects, conform to the design and materi-

al specifications established by IH and now in effect for each particular model truck, unless changed by mutual agreement. Such design and material specifications will be furnished by IH to DCA at or prior to the delivery of orders pursuant to Section F(a) hereof [i. e., October 31, 1968].

⋅　　⋅　　⋅　　⋅　　⋅

[A](d) IH agrees to furnish to DCA such technical information, blueprints, plans, drawings and the like currently existent and in IH's possession as would facilitate production by DCA of specification trucks or M-800 trucks (the foregoing being hereafter referred to collectively as "technical information").

Crucial to resolution of Dynamics' claims is the determination of exactly what sort of technical information the contract required International to deliver to Dynamics. Dynamics maintains that the contract contains a broad warranty by International that all technical information provided would be totally up to date, accurate and complete; in effect, that International warranted Dynamics would encounter no difficulty in manufacturing Metro trucks if it adhered to the International drawings and specifications. Dynamics charges that this warranty was breached when, after the date specified in the contract, International delivered allegedly incomplete, inaccurate and outdated technical information that did not reflect changes and revisions in Metros as they were produced when International shut down the Works.

Clearly, as plaintiff's counsel conceded at the trial,[14] paragraph A(d) of the contract

13. *See* cases cited in note 11 *supra*; *Division of Triple T Serv., Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191, 200 (Sup.Ct. 1969), *aff'd mem.*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dep't 1970). International argues that even if the contract as a whole is not within the coverage of the UCC, the Article Two statute of limitations should nevertheless be held applicable to claims for breach of those provisions that do deal with the sale of trucks. Relying solely on *Foster v. Colorado Radio Corp.*, 381 F.2d 222 (10th Cir. 1967), International asserts that the contract may be broken into parts for purposes of applying the UCC and that claims

arising under provisions contemplating transactions in goods should thus be governed by the four-year statute of limitations. *Foster,* however, did not deal with the application of statutes of limitations, did not involve a contract requiring the rendition of services and other performance beyond the mere sale of assets, and, in any event, has not found acceptance in New York courts. *See* cases cited in note 11 *supra.*

14. "I would agree ⋅ ⋅ ⋅ that under A(d) there is no warranty, there is no representation that the technical information that is being turned over would be in any particular way. It

contains no obligation by International to turn over accurate or complete drawings or technical information; rather, that paragraph expressly required International to provide Dynamics only with such plans, drawings, blueprints or other information as were both then in existence and in International's possession and as would "facilitate production by Dynamics of . . . trucks." Recognizing this, counsel for Dynamics relies upon paragraph A(b), which required International to turn over "design and material specifications" to which Dynamics' trucks were to conform. Dynamics argues that this paragraph implicitly warranted that a full and accurate set of design and material specifications covering Metros as they were produced in August 1968 was in existence and would be given to Dynamics. The very language of the two relevant paragraphs, however, indicates that plaintiff's argument of a warranty must be rejected.

Paragraph A(d) defines International's duty to Dynamics with respect to turning over a broad range of technical information that would aid Dynamics in operating the Works. Paragraph A(b), on the other hand, protects International by placing an obligation on Dynamics to build trucks to International's requirements. Obviously, Dynamics could not be expected to build "specification trucks" to conform "to the design and material specifications established by IH and now in effect" without knowledge of such specifications, and International accordingly agreed in paragraph A(b) to provide Dynamics with the relevant information. This agreement, however, was made in the limited context of assuring International that it would not be obligated to purchase trucks that did not meet its standards; it did not

constitute a broad representation that absolutely complete and accurate specifications would be turned over or that Dynamics could successfully base bids for contracts with other purchasers upon such specifications. International's commitment was only to deliver specifications then "currently existent" and "now in effect."

To read in a warranty as to accuracy of the technical data would alter the parties' agreement. Indeed, Dynamics' president testified that during negotiations his company never requested warranties concerning the quality of International's specifications, but that it was International's representatives who insisted that trucks be built to International standards. Both his testimony and that of International officials indicates that paragraph A(b) was agreed upon at International's insistence and for its sole benefit. Thus, International's promise to provide Dynamics with specifications must be evaluated in the limited context of Dynamics' obligations to build trucks for International to conform to "design and material specifications . . . [then] in effect." International's obligation under paragraph A(b) provides no basis for Dynamics' recovery of losses sustained on the Post Office contract due to alleged underbidding.

■ Although paragraph A(b) does not constitute a warranty running from International to Dynamics with respect to technical information, New York law would impose a duty on International under that paragraph to act in good faith and furnish specifications that would give Dynamics a reasonable opportunity to comply with its obligation to build trucks "to specifications."[15] Thus, International would be lia-

is what is currently existent and in IH's possession." Transcript, 1424–27.

15. *See Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 608, 285 N.E.2d 849 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 85–87, 188

N.E. 163 (1933); *Wood v. Lucy, Lady Duff Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917); *Madison Pictures, Inc. v. Pictorial Films, Inc.*, 6 Misc.2d 302, 151 N.Y.S.2d 95, 118 (Sup.Ct. 1956); *cf. Kooleraire Serv. & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 320 N.Y.S.2d 46, 48, 268 N.E.2d 782 (1971) (party to a contract may not rely on condition the occurrence of which he hindered or prevented); *Arc Elec. Const. Co. v. George A. Fuller Co.*, 24 N.Y.2d 99, 299 N.Y.S.2d 129, 132, 247 N.E.2d 111

ble for any expenses incurred by Dynamics due to specifications that under the circumstances were so deficient or inconsistent as to impose an unreasonable and uncontemplated burden on Dynamics to comply with paragraph A(b).[16]

The evidence introduced at trial made it abundantly clear that International acted in complete good faith and with substantial dedication in providing Dynamics with specifications and other technical information concerning Metros. On October 29 and 30, 1968, International representatives turned over to Dyna-Truck both a complete blueprint file, covering each Metro part and component for which International had maintained drawings, and a substantially complete set of accounting or production specifications, which International employees had updated after the shutdown in an attempt to reflect exactly what parts were being used in Metros at the time International ceased production. The International planning department's master computer specifications used at the Works had been sent to International's record and retention center in Chicago at the time of the shutdown and were not available at Bridgeport on October 30. International did commit itself to transfer these specifications to Dyna-Truck as soon as possible, and they were in fact sent to Dyna-Truck in mid-November. Pursuant to an arrangement reached at the October meeting, International sent Dyna-Truck a full set of "reproducible" drawings, which could be photocopied, on November 22, 1968. In addition, International mailed three sets of the International organization's standard parts books to Dynamics in mid-November, and because some Dyna-Truck employees professed unfamiliarity with the use of specifications in manufacturing, International provided Dyna-Truck with an up-to-date textbook that explained the International system.

Indeed, there is no showing that International failed to furnish Dynamics with the technical information then currently existent and in International's possession as would facilitate production by Dynamics of specification trucks or M–800 trucks. To the contrary, the evidence abundantly establishes that International fulfilled its obligation under paragraph A(d) of the Truck contract to furnish the technical information required thereunder. By the end of November, 1968, International had delivered to Dyna-Truck all the engineering drawings, specifications and other technical information relating to Metros that International had used when it operated the Works. By the end of December, Dyna-Truck was either set or given ready access to other technical information and specifications concerning "special equipment" sometimes ordered by Metro customers. During these periods in which information was delivered, Dyna-Truck was in the process of hiring employees, rearranging certain production lines, and readying the plant for production. Although some fabrication of parts had commenced in November or December, the delivery of certain specifications after the date specified for delivery in the contract was not shown to have any adverse effect, in and of itself, on Dyna-Truck's operations.

International also fulfilled its obligation under paragraph A(b) of the Truck contract. The information delivered was of a commercially acceptable quality and afforded Dyna-Truck a reasonable opportunity to comply with its obligations to build trucks "to specifications." Moreover, when problems did develop, International was quick to assist Dyna-Truck in every way possible to remedy them. Most of the problems were

(1969) (same); *Rochester Plumbing Supply Co. v. Burgart, Inc.*, 49 A.D.2d 78, 370 N.Y.S.2d 716, 720 (4th Dep't 1975); *Application of Heyliger*, 39 A.D.2d 698, 332 N.Y.S.2d 253, 255 (1st Dep't 1972) (same).

16. *See, e. g., Norcross v. Wills*, 198 N.Y. 336, 341–42, 91 N.E. 803 (1910); *Peckham Road Co. v. State of New York*, 32 A.D.2d 139, 300 N.Y.

S.2d 174, 176–77 (3d Dep't 1969), *aff'd,* 28 N.Y.2d 734, 321 N.Y.S.2d 117, 269 N.E.2d 826 (1971); *Shore Bridge Corp. v. State of New York*, 186 Misc. 1005, 61 N.Y.S.2d 32, 40 (Ct. Cl.), *aff'd,* 271 App.Div. 811, 66 N.Y.S.2d 921 (4th Dep't 1946); *E. W. Foley, Inc. v. State of New York*, 61 N.Y.S.2d 118, 121 (Ct.Cl.1946).

not significantly different from those that International itself had experienced in its day-to-day operation of the Works, and they were easily discovered and remedied without Dyna-Truck incurring any extra expenses or lost production time. These problems were resolved for the most part by a single, salaried Dyna-Truck employee in consultation with the International technical representative and with former International employees that Dynamics had hired to operate the Works. Dynamics demonstrated only one instance, the consequences of which were not significant, in which a production line was held up temporarily, and this delay was not due to a faulty drawing or specification but to Dyna-Truck's own use of a template that did not match the accurate specifications provided by International. Dynamics also failed to carry its burden of proof on its contentions that unusable parts were ordered or fabricated due to faulty drawings and that certain unusable parts had to be sold at a loss.

The insubstantial nature of Dynamics' claims relating to technical information is further evidenced by the facts that Dyna-Truck was able to produce its first Metro only three months after taking over the Works—a full three months ahead of Dynamics' own estimates—and that the first trucks, as Dynamics concedes, were produced in substantially the same configurations as those International had manufactured when it closed the Works.[17] Indeed, International never complained that any of the trucks produced by Dyna-Truck failed to comport with design or material specifications. Moreover, even though Dynamics had no prior experience in mass production operations such as those undertaken at the Works, it was able, notwithstanding alleged problems with the technical information, to manufacture trucks "without a hitch" only six months after producing its first vehicle. The problems that arose were not unlike those encountered on a shakedown cruise of a vessel.

Dynamics has failed to carry its burden of proof that the design and material specifications delivered to it by International were materially deficient, interfered significantly with Dynamics operations, or caused Dynamics any damages. Moreover, Dynamics introduced no competent evidence that would provide the Court with a basis for calculating damages had they in fact been incurred. Accordingly, Dynamics' technical information claims are dismissed in their entirety.

(c) Forecasts.

██ The Truck contract provision relating to forecasts of International's requirements for trucks reads as follows:

Not later than December 15, 1968, IH will forward to DCA a forecast of its requirement for specification trucks [i. e., the three largest Metro models], by model, or M–800 trucks, which it contemplates ordering within the second three month period of this Agreement. Following such initial forecast, IH will forward additional forecasts for each succeeding quarterly period not less than six weeks prior to commencement of each such quarterly period, indicating by model the specification trucks or M–800 trucks it contemplates ordering for delivery during each calendar month within each such quarterly period.

Dynamics claims that International failed to provide it with the required forecasts and that Dynamics was therefore unable to maintain a balanced inventory in anticipation of future orders and unable to fill such orders expeditiously when they were received.

The competent evidence establishes that International provided written quarterly forecasts in technical compliance with the agreement at least until early 1970. After this time, International may not have regularly provided formal, written forecasts, but it did work in close cooperation with Dyna-Truck's general sales manager, John Grimes, to provide advance forecasts of its monthly and yearly needs. Grimes, who

---

**17.** Pretrial Stipulation ¶ 27.

was the Dyna-Truck employee responsible for receiving forecasts, testified that the forecast information provided by International fulfilled the requirements of the contract until the latter part of the contract period, at which time future sales information "petered out." However, Dyna-Truck's president during 1971 testified that International worked closely with Dyna-Truck in generating forecasts in that year. On at least one occasion, International went well beyond what was required under the contract and canvassed urban areas to provide Dyna-Truck with a requested forecast of particular Metro components and options that were likely to be ordered.

The Court is satisfied that during the latter part of the agreement International adequately and substantially complied with its forecast commitment. Dynamics has not shown that failures during this period to submit written forecasts in technical compliance with the agreement caused Dyna-Truck any harm whatsoever. Any possible adverse effect of such technical failures on Dyna-Truck's inventory situation was overcome by International's continued assistance in generating sales projections that may not, however, have issued on the dates specified in the contract or covered the requisite three-month periods. In sum, the parties had effected a practical working arrangement to satisfy Dynamics' need for forecasts.

More importantly, the forecasts required by the agreement, even if received, would not have been of use to Dyna-Truck in the latter part of the contract period. First, the contract obligated International to deliver forecasts covering only the various Metro models it anticipated ordering. Dyna-Truck soon learned that such forecasts were of very limited usefulness because they did not contain estimates of the types of engines, transmissions, differentials and other options that would be ordered. Dyna-Truck therefore began to generate its own forecasts of both models and components, and in addition to being comprehensive, these forecasts proved to be more reliable than those submitted by In-

ternational. As noted, Dyna-Truck also called on International to develop estimates concerning trends in the ordering of components and options. Thus, towards the latter part of the contract term, Dyna-Truck did not rely, and would not have relied, on the forecasts required by the contract. Second, during this period, the time it took for Dyna-Truck's suppliers to fill orders for Metro parts and equipment had so increased that Dyna-Truck was required in many instances to place such orders well in advance of the time when forecasts were due for the Metros that would require such parts and equipment. International forecasts would not have aided Dyna-Truck in regulating its inventory during this period.

In sum, any failure on the part of International to provide written forecasts in strict compliance with the contract during the latter portion of its term had no effect on Dyna-Truck's operations and caused no damages. On the contrary, Dyna-Truck's inventory problems stemmed from its own management's practices, from difficulties with suppliers who deemed Dyna-Truck a poor credit risk and refused to deliver supply orders unless Dynamics paid cash, and from demands made upon Dyna-Truck by its parent corporation, Dynamics. The claims relating to International's failures to supply forecasts are thus without merit and must be dismissed.

(d) Breach of Annual Purchases and Minimum Monthly Orders Requirements.

Dynamics contends that Dyna-Truck's operating losses are attributable principally to International's failures to place minimum monthly orders and to purchase minimum annual numbers of Metros under the Truck contract. The contract required International to purchase at least 3,000, 2,500 and 2,000 trucks, respectively, in the three annual periods beginning in November of 1968, 1969 and 1970. The agreement also required International to place firm orders for at least 250 specification trucks each month from February 1969 through September 1969, and to place at least 180 and 150 monthly orders, respectively, in the two

annual periods beginning in November 1969 and 1970.

International's alleged failures to comply with these provisions cannot be measured with certainty because most of the Dyna-Truck records relating to Metro sales and orders were not preserved by Dynamics after Dyna-Truck curtailed its operations at the works.[18] The basic document upon which Dynamics relies to establish its claims is a running tally of International's net monthly orders that was maintained by Grimes, Dyna-Truck's general sales manager. However, this chart understates the number of orders actually placed by International each month because Grimes subtracted cancellations of previously placed orders from current monthly orders to reach the total monthly orders shown in his compilation. International is entitled to credit for orders placed and subsequently cancelled for good cause, including delivery delays by Dyna-Truck. Thus, Grimes' "netting" process fails to reflect both monthly and total orders placed. Moreover, the monthly reports from which Grimes derived his figures were themselves based on entries in Dyna-Truck's log books, no longer in existence, which in some instances did not adequately reflect the dates of receipt of orders. Despite these errors, it is possible to calculate roughly the number of trucks purchased and orders placed by International.

The only year in which International failed to meet its minimum annual purchase requirements was the first, when it purchased 2660 of the required 3000 truck minimum. International failed to place the specified minimum number of orders in about fifteen of the thirty-three months to which the minimum applied; however, in only twelve of those fifteen months were the shortfalls significant. International argues that these failures to comply with the terms of the contract were excused by Dynamics' own breaches of the contract and, in any event, did not cause Dynamics any damages.[19]

In seeking to justify its failure to purchase the full quota of 3,000 trucks in the first contract year, International asserts that Dynamics hampered International's truck sales (1) by failing to deliver trucks within the time specified in the contract; (2) by failing to make available popular options and equipment; and (3) by giving priority to production of Post Office vehicles in violation of the agreement. During the first year, Dyna-Truck was in substantial compliance with the contract provisions requiring it to fill orders within six weeks of placement. It is true that there were instances when it made deliveries in approximately eight weeks instead of six, but these two-week delays were not in and of themselves sufficient to excuse International from purchasing the specified minimum annual number of trucks.

However, Dyna-Truck clearly concentrated its engineering efforts during the first year in preparing for production of Post Office vehicles rather than commercial vehicles to be delivered to International. As a result of this concentration, Dyna-Truck was unable to introduce a much-sought six-cylinder engine into the commercial Metros, and International was thus not able to sell Metros to a substantial number of customers who demanded that option. Before the Truck contract was signed, International gave Dynamics notice that the International six-cylinder engine would not pass the 1969 federal emission standards and that a new engine would have to be designed for

18. The pertinent records were in existence in late 1972 after Dynamics retained counsel in this matter, but before the complaint in this action was filed the records were disposed of. Dynamics has not come forward with an adequate explanation for failing to produce these documents.

19. *See Hadden v. Consolidated Edison Co.,* 34 N.Y.2d 88, 356 N.Y.S.2d 249, 254–55, 312 N.E.2d 445 (1974); *Fitzgibbons Boiler Co. v. National City Bank,* 287 N.Y. 326, 331–33, 39 N.E.2d 897 (1942); *In re People by Phillips,* 250 N.Y. 410, 419–20, 165 N.E. 829 (1929); *Philip Zweig & Sons, Inc. v. Tuscarora Const. Co.,* 50 A.D.2d 1069, 376 N.Y.S.2d 761, 763 (4th Dep't 1975); *Helman v. Dixon,* 71 Misc.2d 1057, 338 N.Y.S.2d 139, 143 (Civ.Ct.1972); cases cited in note 15 *supra.*

Metros. Dynamics undertook in the Truck contract to produce trucks in accordance with the new standards; moreover, it subsequently represented that it would incorporate an American Motors Corporation "6–232" six-cylinder engine into Metros in 1969. The engineering changes were to be completed in May 1969 with production of six-cylinder Metros to commence shortly thereafter.

In January 1969, however, before it had produced its first complete truck, Dynamics entered into a contract to manufacture 6,961 substantially modified M–800 vehicles for the United States Post Office. International had expressed its concern that this undertaking would interfere with Dyna-Truck's ability to fulfill its commitments under the Truck contract, but Dynamics was confident that both contracts could be honored simultaneously. In fact, Dynamics' strong concentration in 1969 on Post Office vehicles delayed the introduction of six-cylindered Metros for over a year, despite International's volunteered assistance in effecting the necessary design changes. Thus, Dynamics did not release the necessary engineering changes until October 1969—after it had readied the Post Office vehicles to accept the six-cylinder engines—and actual production of commercial six-cylinder Metros did not commence until about May 1970. This delay was due to Dynamics' unilateral decision to give the Post Office contract priority, a decision made in the face of a term in the Truck contract—broad enough to proscribe Dynamics' action—which required Dynamics to give "production line priority" to International's orders and to "cooperate to establish any further scheduling . . . procedures deemed necessary to accomplish this result." Moreover, Dynamics was well aware that International's ability to sell the minimum number of Metros was largely dependent at the time on the availability of six-cylinder engines for which there was a high consumer demand. Dynamics' failure to include the 6–232 six-cylinder engine in

Metros and its decision to give preference to Post Office trucks caused numerous cancellations of orders by International customers. Dynamics' actions unreasonably frustrated International's ability to comply with the Truck contract minimum purchase requirements, and thus excused the shortfall of 340 purchases in the first year of the contract, which would not have occurred had the six-cylinder engine been made available in a timely manner.[20]

Dynamics' claims relating to International's failures to place minimum monthly orders are similarly without merit. In this instance, too, Dynamics' failure to introduce the 6–232 engine within a reasonable time, which hampered International's efforts to sell the commercial vehicle, unduly interfered with its commitment to place the required monthly orders. More importantly, when Dynamics began producing Post Office vehicles in late 1969, it pursued its deliberate policy of giving those vehicles production line priority in clear contravention of the Truck contract. As a result, production of commercial vehicles decreased from mid-1969 levels, an enormous backlog of commercial vehicle orders developed, and longer and longer commercial Metro delivery delays resulted. These delays not only caused justifiable cancellations of many International orders, but also had an extremely adverse effect on the market for Metros, since International's customers were unwilling to place orders without reasonable assurance of timely delivery. Indeed, Dyna-Truck's backlogs were so consistently large that there were many times when it was pleased not to receive International's orders, because it was not in a position to meet the delivery requirements under the contract. The situation was so bad that Dyna-Truck's then president announced the need for a special campaign "to reestablish our credibility of producing vehicles." Under the circumstances, International's various failures to place minimum monthly orders were excused by Dynamics' own conduct.[21]

**20.** *See* cases cited in notes 15, 19 *supra*.

**21.** *Id.*

In any event, the International breaches of the minimum monthly order requirements had no impact on Dynamics' operations and caused Dynamics no damages. The manifest purpose of these requirements was to ensure Dyna-Truck an even flow of production and to guard against the possibility of idle production lines. However, from the first month in which minimum orders were required, Dynamics had a more than adequate backlog of International orders to keep its production lines busy and to allow it to coordinate manufacturing operations. Only in late 1969 was this backlog reduced to the point where future failures to submit minimum monthly orders might have begun to affect operations. At this very time, however, Dynamics began production on the Post Office contract, gave Post Office vehicles production priority, reduced its output of commercial Metros and thus precipitated a drastic rise in the commercial order backlog.

Both the existence of the large Post Office contract and the rising commercial backlog ensured Dynamics a smooth and continuous flow of production, subject only to Dynamics' own ability to run the Works. In late 1969 and throughout 1970, Dyna-Truck produced only twenty or thirty trucks a day, however, and more than half these trucks were Post Office vehicles. Dynamics' limited production of commercial vehicles and its steadily increasing backlog of commercial orders establish that International's failure to place certain minimum monthly orders had no effect on commercial production.[22] During the entire contract term, Dyna-Truck was never forced to limit or cease production due to any lack of orders. Indeed, the production difficulties that Dynamics attributes to International's failures to order vehicles were instead the

result of Dyna-Truck's own myriad problems of inefficient management, overcommitments, ineffective inventory control practices, inadequate cash flow, vendors' refusals to extend credit, poor workmanship, labor relations and low production capacity. International did not cause these problems and cannot be held accountable for them. In sum, Dynamics' claims relating to the minimum order provisions of the contract have not been sustained and accordingly are dismissed.

(e) Claims Relating to International's Efforts to Sell More Than the Minimum Number of Trucks.

 Dynamics' final contractual claim is that International, in violation of the Truck contract, failed to make diligent efforts to sell through its marketing organization more than the minimum number of trucks required to be purchased from Dynamics under the agreement. Dynamics also has failed entirely to carry its burden of proof on this issue.

In the second and third contract years, International did purchase more than the minimum number of trucks required. That it did not exceed the minimums by more than a few hundred trucks does not establish that it did not use its best efforts to do so, for the contract required only that International diligently *endeavor* to sell additional trucks. The evidence establishes that International fully complied with its obligation under the Truck contract to make diligent efforts to sell more than the minimum number of Metros it was required to purchase from Dynamics.

## III. FRAUD CLAIMS

Dynamics alleges that it was fraudulently induced to enter into the Works and Truck

---

**22.** For example, Dynamics can hardly be heard to complain that International's shortfall of 60 orders in April 1970 damaged its production efforts at a time when it was producing only about 10 commercial Metros a day and had a backlog of about 350 commercial orders. Similarly, International's most serious breach in the third year of the contract involved a failure to order 75 additional vehicles at a time when Dynamics had a backlog of nearly 1200 com-

mercial orders. Only in 1971, under its fourth consecutive general manager, did Dyna-Truck increase its output to the point where it was able to handle both Post Office and commercial production. At this time, however, the backlog of commercial orders was so great that International's subsequent failures to meet monthly order requirements had no effect on Dyna-Truck's operations.

contracts by International's false representations that its accounting records were accurate and that it possessed complete and accurate technical information relating to the production of Metros.

### (a) Statute of Limitations Claim.

International contends that these claims are barred by the applicable six-year statute of limitations [23] because the parties reached a binding agreement prior to October 16, 1968, the date of the written contracts. International thus urges that Dynamics' cause of action for fraud accrued more than six years prior to October 15, 1975, when the present suit was commenced.

International's argument on this point must be rejected. The cases upon which it relies in support of its contention deal with whether a party may enforce an agreement that has been reached but that has not yet been memorialized in a formal document.[24] These cases cannot be read to control determination of the accrual of a cause of action for fraud when the parties, as here, have in fact entered into a formal written contract that by its terms supersedes all previous agreements and contains the entire understanding of the parties. In such a case, the cause of action accrues when the document is executed and when the party alleging fraud has given consideration and thus suffered damage.[25] Dynamics' fraud claims are therefore not barred by the statute of limitations since the formal contracts between it and International were not entered into until October 16, 1968, on which date it made payment for the Works.

### (b) Claims Relating to Technical Information.

Dynamics claims that during the contract negotiations, International falsely represented it possessed accurate and complete technical information relating to the manufacture of Metros as they were produced as of August 8, 1968. This representation is asserted to have been either express or implied and to have been made knowingly or recklessly or, in any event, negligently. Dynamics states that, lacking experience in the manufacture of trucks, it relied upon the existence of complete and accurate technical information in entering into the contracts and was damaged by the absence of such information.

The evidence establishes, however, that during negotiations International neither made any express representations nor did or failed to do anything from which an implied representation might be inferred concerning the quality or completeness of extant technical information. As previously noted in considering plaintiff's breach of contract claim, International did require that Dynamics build specification trucks to conform to the design and material specifications then "in effect," but International did not represent that the extant specifications were accurate or complete, and no such implication arose under the circumstances. Indeed, the references to specifications upon which Dynamics relies were only made in the context of setting the standards for the trucks Dynamics was obligated to build. Dynamics was aware that International had been producing trucks at the works up to the time it decided to close its plant. Dynamics, even though a new-

---

**23.** N.Y.C.P.L.R. §§ 203, 213(9) (McKinney 1972); *Rickel v. Levy*, 370 F.Supp. 751, 755 (E.D.N.Y.1974).

**24.** *See, e. g., V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Karson v. Arnow*, 32 Misc.2d 499, 224 N.Y.S.2d 891 (Sup. Ct.1962).

**25.** *See, e. g., Hanlon v. Macfadden Publications, Inc.*, 302 N.Y. 502, 510, 99 N.E.2d 546 (1951); *Inman v. Merchants Mut. Cas. Co.*, 274 App.Div. 320, 83 N.Y.S.2d 801, 803 (1948); *Cooke v. Colman*, 150 Misc. 294, 269 N.Y.S. 21, 23 (1st Dep't 1934).

comer to the field, was a burgeoning conglomerate whose executives had confidence that it had the know-how, based on its varied experience in other fields, that would enable it, with the available and existing technical information, to produce the trucks. The parties did not discuss whether Dynamics could step in and produce trucks without difficulty by relying solely on existing technical information in International's possession. Dynamics was confident, if not overconfident, that it could. The fact is that at no time during the extensive negotiations leading to the contract did Dynamics, which was represented by experienced counsel, ever request the inclusion of a warranty or representation which is the basis of its charge of fraud. It is significant that Dynamics failed to call those attorneys to testify as to this aspect of its claim.[26]

Moreover, it is clear that International did not knowingly or recklessly suppress or conceal any information relating to deficiencies in its specifications or technical data. At the time the International negotiators referred to International's Metro specifications, they knew that the specifications were of commercially adequate quality and that Metros had in fact been produced successfully with specifications on hand. In sum, no representations were made that International's specifications were complete or accurate and those statements that were made concerning the then existent specifications were based upon prior demonstrated experience of their commercial utility, were made in complete good faith, with reasonable belief in their truthfulness, and without any intent to mislead or unduly influence Dynamics. Thus, Dynamics has not established its allegations of materially false representations or of scienter necessary to render International liable for fraud.[27]

Dynamics asserts, however, that in any event International is liable in fraud for negligent nondisclosure of deficiencies in its technical information because a special, intimate relationship beyond that of ordinary parties to commercial contracts existed between them.[28] The Court is not satisfied that the actual relationship between the parties was such that the New York rule imposing liability for negligent representations would apply. Assuming the contrary, however, International would not be liable to Dynamics because under the circumstances the failure to investigate or disclose the alleged shortcomings of the technical information on hand was not negligent. International had been producing trucks at the Works up to the time of the shutdown of its plant using extant technical data, the very data turned over to Dynamics, and was aware that Dynamics planned to rehire (as it did) many of the International production employees to operate the Works. There was thus no reason to believe that Dynamics would encounter any difficulty— beyond that attributable to its inexperience—in producing Metros.

In addition, as previously noted, the available technical information was of a commercially acceptable quality and, in fact, the defects that did exist were not material and did not cause Dynamics significant production problems or pecuniary

26. Felice v. Long Island R.R., 426 F.2d 192, 194–95, (2d Cir.), cert. denied, 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); Christman v. Maristella Compania Naviera, 349 F.Supp. 845, 852 (S.D.N.Y.1971), aff'd, 468 F.2d 620 (2d Cir. 1972); Leear v. John W. McGrath Corp., 52 A.D.2d 804, 383 N.Y.S.2d 342, 343 (1st Dep't 1976); Gill v. Anderson, 39 A.D.2d 941, 333 N.Y.S.2d 49, 50–51 (2d Dep't 1972).

27. Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214 (1969); Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958); Hanlon v. Macfadden Publications,

Inc., 302 N.Y. 502, 509, 99 N.E.2d 546 (1951); Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp., 51 A.D.2d 140, 379 N.Y.S.2d 873, 878–79 (4th Dep't 1976); Mendelow v. Slabodkin, 47 A.D.2d 712, 365 N.Y.S.2d 296, 297 (4th Dep't 1975).

28. See International Prods. Co. v. Erie R.R., 244 N.Y. 331, 337–38, 155 N.E. 662 (1927); Coolite Corp. v. American Cyanamid Co., 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dep't 1976); Dorsey Prods. Corp. v. United States Rubber Co., 21 A.D.2d 866, 251 N.Y.S.2d 311, 313 (1st Dep't 1964), aff'd, 16 N.Y.2d 925, 264 N.Y.S.2d 917 (1965).

damages. In sum, Dynamics has failed to show either that the failure to make such a disclosure was material or that it caused ascertainable damage to Dynamics.[29]

(c) Claims Relating to Accounting Information.

■ Dynamics' final fraud claim is that International misrepresented that the costs reflected on the Works' accounting records were accurate and specifically failed to inform Dynamics that certain direct labor costs had been accounted for in those records as overhead. In this instance, too, there is no basis for any claim of any affirmative statement or representation with respect to those items or the accuracy of International's accounting records. As will be recalled, at Dynamics' request International allowed a representative of Dynamics' independent auditors, Alexander Grant, to inspect the Works, observe operations, and review the books and records maintained there. Dynamics contends that its decision to purchase the Works was in large part influenced by this study of the Works. Alexander Grant's report to Dynamics projected that Dynamics could attain a profitability of about 3.5 per cent on its operations at the Works, a rate substantially less than that enjoyed by other Dynamics divisions. It is claimed that this conclusion would not have been reached and that Dynamics would not have proceeded to purchase the Works had the alleged errors in the cost accounts been disclosed to Mr. Batchelor, the Alexander Grant representative.

At trial, however, Dynamics failed to prove either its general allegation that International's accounting records were inaccurate or its specific allegation that direct costs of labor were "hidden" in overhead accounts. The first allegation is based on

Dynamics' contention that International's technical data was incomplete and inaccurate and thus that International's "standard costs" for fabricated components, purchased parts and manufacturing operations were substantially understated, leading Dynamics to believe it could realize a greater profit than possible. This assertion is without support. The books and records reviewed by Batchelor did not merely reflect International's "standard costs," which were annual accounting estimates of costs associated with various facets of production, but rather displayed the costs of production actually experienced by International at the Works. These actual costs consisted of the costs shown in the standard costs accounts and other accounts *plus* any differences in costs actually encountered from standard costs, which differences were contained in "variance" accounts. Actual operating costs were easily derived by adding together the standard costs and the variances associated with such costs over a production period. This type of accounting was shown to be widely used and completely acceptable in the accounting industry. Dynamics made no showing that any of International's actual costs were misstated, and Batchelor's testimony establishes that he was familiar with International's accounting procedures and that he based his report to Dynamics on the actual costs of production reflected in International's books.[30]

Similarly, Dynamics did not establish its further claim that direct costs of labor were hidden in International's overhead accounts. The books and records reviewed by Batchelor contained an overhead account labeled "09" that, according to the International accounting manual shown to Batchelor, reflected "allowances for operating conditions," *i. e.*, costs of production due to trouble with equipment or other inefficiencies

---

29. *See* cases cited in notes 25, 27 *supra*.

30. It is true that after the contracts were executed, Dynamics requested, and International provided, some standard cost information that International had developed while it operated the Works. International had no obligation to provide this information and received no consideration for it. Moreover, International carefully instructed Dynamics that the cost information could not be relied upon as anything but a very rough guide to what Dynamics' costs might be and that, if anything, Dynamics' costs would be higher than those experienced by International. This transaction provides no basis for any claim of fraud.

in operations beyond the control of the workers. Dynamics asserted at trial that the 09 account, which showed an annual figure of $241,000, in fact reflected costs of "untimed labor," *i. e.*, costs of labor operations for which no "standard" had yet been established [31] and which therefore would not yet be contained in the direct labor or variance accounts.

Batchelor assumed in his study, somewhat unrealistically, that the entire $241,000 in the 09 account could have been eliminated under a Dynamics operation. If this goal could have been effected, Dynamics would have been able to reduce its overhead expenses and realize a correspondingly greater profit on its sales. If, on the other hand, the 09 account contained costs such as untimed labor that were not overhead expenses but were variable expenses related to production, the 09 figure could not have been reduced by improving operating conditions. Instead, the overhead figure would have increased with production, since more untimed labor would be incurred as more trucks were manufactured, and profits would be reduced accordingly. Moreover, the presence of a direct labor cost in an overhead account would tend to understate the variable costs of production and thus lead to an overly-optimistic expectation of profits. The evidence adduced at trial, however, fails to establish that International's untimed labor costs were in fact carried in the 09 account at any time or in any amount. Under the circumstances, no misrepresentation can be attributed to International, for its accounting records were not proved inaccurate. Dynamics' claim relating to hidden labor costs must therefore be dismissed.

## IV. CONCLUSION

Because the foregoing discussion addresses each of Dynamics' claims separately, it cannot serve adequately to call attention to what emerged at trial as the most distinctive and pervasive characteristic of this lawsuit. After careful evaluation of the testimony and demeanor of the witnesses and of the numerous documents introduced into evidence, the Court is left with the clear conviction that Dynamics, in purchasing the Works and in undertaking to build Metros for International, simply bit off more than it could chew. This action, filed on the very eve of the expiration of the statute of limitations, is merely a belated attempt by Dynamics to salvage something out of its unsuccessful venture by casting the blame for Dyna-Truck's difficulties on International.

Dyna-Truck and Dynamics, however, were themselves responsible for the misfortunes that occurred at the Works. At trial, Dynamics did not emerge as a defrauded or aggrieved party; rather, the picture that developed was of a nascent conglomerate that attempted, perhaps overeagerly, to expand into an area in which it had no prior experience, and, due to its own mistakes and to external factors beyond its control, failed in the attempt. Having steeply committed itself to produce trucks for the government and International, Dyna-Truck failed to rise to the challenge. Poor management, inefficient inventory practices, labor problems, cash shortages, difficulties with vendors, the ill-advised Post Office contract, and a downturn in the economy all combined to preclude Dyna-Truck from realizing its full productive potentialities. The costs of that failure must fall on the shoulders of the party responsible for it—in short, Dynamics is not entitled to recover its losses from International as though the latter had indemnified Dynamics against them.

There remains for final consideration International's counterclaim. This is based upon Dynamics' failure to deliver trucks no later than six weeks after receipt of orders and its failure to grant "production line priority" to International's orders. The Court has already noted in considering Dynamics' claims that such breaches did in

---

**31.** A standard cost for a particular labor operation is arrived at by conducting a time study of that operation, determining the average time necessary to complete the necessary labor and multiplying that time by the applicable wage rate. ·

fact occur and did cause cancellation of numerous International orders. International seeks to recover lost profits on "retail sales" orders that were cancelled. But International has offered no adequate proof of damages to entitle it to an award for Dynamics' breaches.[32] Accordingly, the counterclaim is dismissed.

The foregoing, together with the stipulated facts set forth in the pretrial order, shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**32.** *Haughey v. Belmont Quadrangle Drilling Corp.*, 284 N.Y. 136, 142, 29 N.E.2d 649 (1940); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 109, 121 N.E. 756 (1919); *Dillon v. Magner*, 29 A.D.2d 759, 287 N.Y.S.2d 519, 521 (2d Dep't 1968); *Dunkel v. McDonald*, 272 App.Div. 267, 70 N.Y.S.2d 653, 656 (1st Dep't 1947), *aff'd* 298 N.Y. 586, 81 N.E.2d 323 (1948); *Walter Janvier, Inc. v. Baker*, 229 App.Div. 679, 243 N.Y.S. 173, 174 (1st Dep't 1930).