Ben RICKEL, on behalf of himself and all other purchasers of securities in Clinton Hill Associates, similarly situated, Plaintiff,

v.

Sydney V. LEVY et al., Defendants.

No. 71 C 774.

United States District Court, E. D. New York.

Feb. 15, 1974.

George Sapan, Brooklyn, N. Y., for plaintiff; Marshall G. Kaplan, Brooklyn, N. Y., of counsel.

Herrick, Feinstein, Mendelson & Abramson, New York City, for defendants Sydney V. Levy and Miriam S. Levy; Edward M. Abramson and Donald E. Nawi, New York City, of counsel.

D'Amato, Costello & Shea, New York City, for defendant Spahr, Lacher & Berk; Richard G. McGahren, New York City, of counsel.

Kroll, Edelman, Elser & Wilson, New York City, for defendant Roberts & Holland; Herbert Dicker, New York City, of counsel.

BARTELS, District Judge.

Plaintiff Ben Rickel, a limited partner in a real estate partnership designated Clinton Hill Associates ("Clinton"), sues on behalf of himself and others similarly situated, Sydney V. Levy ("Levy") as a general partner, and his wife Miriam S. Levy as a limited partner. In all, 800 limited partners in Clinton invested a total of $3,886,000 in the syndicate.

Plaintiff alleges that defendants,[1] in connection with the prospectus and offering documents used in the sale of partnership participations, engaged in wilful and intentional fraud, made various material misrepresentations and misstatements and omitted to state material facts, in violation of the Securities Act of 1933 § 17(a), 15 U.S.C. § 77q(a); the Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) and Rule X–10b–5 thereunder, 17 C.F.R. § 240.10b–5; 7 N.Y.Gen.Bus.L. § 352–c and subd. 3 (McKinney's Consol.Laws, c. 20 1968); and the common law of fraud and deceit, upon all of which plaintiff relied to his damage.[2]

---

1. It should be noted that the syndicate participations were not registered and did not purport to be registered securities and no showing was made that registration was required. In fact, the prospectus expressly limits the sale of the participations to residents of the State of New York. While federal jurisdiction is based upon Section 22(b) of the 1933 Securities Act and Section 27 of the 1934 Securities and Exchange Act as well as pendent jurisdiction, it would appear that the primary action is one of common law of fraud and deceit and that violations of the federal securities acts were introduced in order to provide federal jurisdiction. It, therefore, becomes apparent that the real body of the case is a state claim and that the federal claim is only an appen-

dage which might, had the matter been properly brought before the Court, deserve dismissal and justify the Court in refusing to exercise pendent jurisdiction. See United Mine Workers v. Gibbs, 383 U.S. 715, at 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and Judge Friendly's discussion in Kavit v. A. L. Stamm & Co., 491 F.2d 1176, at 1180, 2d Cir., 1974.

2. Also named as defendants were Spahr, Lacher & Berk and Roberts & Holland, who originally joined Sydney V. Levy and Miriam S. Levy in making this motion. Spahr, Lacher & Berk are accountants and auditors, who, according to the prospectus, prepared projections for the partnership with respect to gross operating receipts, operat-

Defendants Levy and Miriam S. Levy move for summary judgment to dismiss plaintiff's claim pursuant to F.R.Civ.P. Rule 56, 28 U.S.C., on the ground that there was no genuine issue of fact concerning the bar of the statute of limitations with respect to each and every claim asserted in the complaint. Alternatively, defendants request a separate trial on their statute of limitations defense[3] in the event summary judgment is denied. At the argument plaintiff attacked the validity of his deposition which prompted the Court to have an evidentiary hearing to enable plaintiff to demonstrate by his own testimony and, if necessary, by the testimony of Levy, the principal defendant, that a genuine issue of fact did exist on the statute of limitations claim. Hearings were held, at which plaintiff and Levy testified and at which plaintiff's deposition, which the Court found in all respects valid, was also considered.

Plaintiff invested $20,000 in Clinton by the purchase of a syndicate interest in 1960. In his complaint he premises his action for misrepresentation and fraud on the following acts and failures of Levy: (1) inaugurating an erroneous advertising campaign in the New York Times asserting that a certain union had invested $100,000 in Clinton and causing a certain advertising brochure bearing the name of A. George Golden Corp., to be circulated, containing reprints of newspaper stories with false information and misleading statements to the effect that certain pension funds and unions had invested large sums in Clinton; (2) misrepresenting that Clinton was located in a "traditionally fine" section of Brooklyn while failing to disclose that the property was located in a deteriorating neighborhood requiring larger than normal maintenance and security costs; (3) failing to disclose that the leaseback of the Clinton property to Pierpont Associates, Inc. ("Pierpont") was a sham leaseback to a financially irresponsible corporation with rights to assign the same without liability, and failing to disclose that the lease would soon be defaulted requiring Clinton to undertake the burdens of operating the property at a high cost, thus inflating the purchase price of the property by more than $1,000,000 over its true market price; (4) failing to disclose that the attorneys and accountants did not independently represent the investors but favored Levy's interest, and failing to ascertain whether the financial data obtained from Pierpont was correct; (5) failing to disclose that there was no market for a limited partner's interest in Clinton and that there was no chance to sell the same when

---

ing expenses, amortization of mortgage and depreciation. Roberts & Holland acted as special tax counsel to the partnership and passed upon its tax status as a partnership for federal income tax purposes. During the hearings on this motion, plaintiff withdrew his claims against these two defendants. Pierpont was another named defendant, but has never been served in this action.

3. The N.Y. CPLR became effective September 1, 1963. N.Y. CPA § 48(5), previously applicable, provided:

"§ 48. Actions to be commenced within six years.

. . . . .

(5) An action to procure a judgment on the ground of fraud.
The cause of action in such a case is not deemed to have accrued until the discovery by the plaintiff, or the person under whom he claims, of the facts constituting the fraud."

If the CPA is controlling of the present case, for fraud allegedly occurring in 1960, the plaintiff would have six years to discover the fraud and would be barred only if discovery was made or should have been made by January 24, 1965. It has been held, however, that where a fraud cause of action accrued under the CPA, but was discovered only after the CPLR became effective, plaintiff is entitled to only two years from the time he discovered or should have discovered the fraud. Hoff Research & Dev. Lab., Inc., v. Philippine Nat. Bank, 426 F.2d 1023 (2d Cir. 1970). Even if the six-year provision were applicable, the outcome in this case would be unchanged since, as demonstrated, plaintiff could with reasonable diligence have discovered the alleged fraud prior to 1965.

Clinton became financially involved; (6) failing to disclose that after five years of accelerated depreciation the tax shelter for the investor would begin to disappear so that an increasingly greater proportion of distributions would be declarable as income; and (7) failing to disclose that the partnership raised $700,000 more from the investors than the purchase price of the property, the difference being profit to Levy and the cost of selling the syndicate participations, all resulting in a dilution of the investors' interest in the property, and in that connection failing to inform investors that the "liquidation value" of the property was less by $700,000 than the amount paid for the same by the partnership.

## I

The following facts are undisputed. Clinton bought the Clinton Hill property, the sole asset of the partnership, from Pierpont by paying $3,500,000 and assuming a first mortgage of $9,600,000. As part of the same transaction, Clinton leased the property back to Pierpont for a period of twenty-one years, the latter to pay a net rent of $450,000 plus all taxes, charges and expenses. For two years, the full rent was paid and the limited partners received their forecasted return of 10.5%. On January 10, 1963, Pierpont defaulted on the lease and refused to make any further payments to the mortgagee, to the government for taxes, to utility companies or to Clinton for net rent. Clinton thereupon took over the operation of the Clinton Hill Apartments after giving Pierpont a general release from its obligations. Shortly thereafter, a notice of the default, stating also that distributions would be suspended during 1963 and that a general meeting would be held, was sent to all the partners. The meeting, which was held at Town Hall in New York City on March 11, 1963, was attended by over 400 persons. At this meeting the default of Pierpont as well as other difficulties facing the part-

nership and the operation of the premises was discussed. After Levy made a long speech, the partners were given an opportunity to ask questions about any matter concerning the partnership. In October, 1964, Rickel and Levy met privately in Levy's office and further discussed the problems facing Clinton, and after that meeting Clinton paid out a small distribution. From 1965–70 distributions of from 4 to 6% per year were made, but in 1971, the year in which this action was instituted, distributions were reduced to 3%.

## II

■■ The present action was begun on June 24, 1971, eleven years after plaintiff purchased his interest. N.Y. CPLR § 213(9) (McKinney's Consol. Laws c. 8 1972) provides that an action based upon fraud must be brought within six years after the time the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it." However, this language is modified by N.Y. CPLR § 203(f) (McKinney's 1972), which states that:

"... where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer."

These two sections taken together have been interpreted to mean that fraud actions must be commenced within six years from commission of the fraud or two years from discovery, whichever is longer. Hoff Research & Dev. Lab., Inc. v. Philippine Nat. Bank, 426 F.2d 1023 (2d Cir. 1970); McCabe v. Gelfand, 57 Misc.2d 12, 291 N.Y.S.2d 261, vacated, 58 Misc.2d 497, 295 N.Y.S.2d 583 (Sup. Ct., Kings Co., 1968); 1 Weinstein-

Korn-Miller, N.Y.Civ.Prac. ¶ 203.35 (1972). The fact that the plaintiff raises claims under the federal securities laws does not render the New York limitation statutes inapplicable. When no statute of limitations is specifically provided in the federal legislation, the state time limits apply to federal claims as well as state claims. Klein v. Shields & Co., 470 F.2d 1344, 1346 (2d Cir. 1972); see Moviecolor Limited v. Eastman Kodak Co., 288 F.2d 80 (2d Cir. 1961). Since the alleged misstatements and omissions occurred about eleven years before commencement of the action, and thus are therefore barred, the central inquiry under the New York statute becomes: "When did plaintiff discover or could have with reasonable diligence discovered the fraud?"

### III

■ ■ Plaintiff insists that even though his federal claims are subject to the New York period of limitations, the statute is tolled under the federal equitable tolling doctrine which tolls the running of the statute during periods in which there is fraudulent concealment by the defendant of the alleged wrong. However, the doctrine proves to be of no additional help to plaintiff for even under it, the statute is not tolled from the time when plaintiff discovered or could with reasonable diligence have discovered the wrong. Saylor v. Lindsley, 391 F.2d 965 (2d Cir. 1968); Moviecolor Limited v. Eastman Kodak Co., *supra*. As stated in Morgan v. Koch, 419 F.2d 993, 997 (7th Cir. 1969): "The party seeking protection under this doctrine must have exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." Thus, under both federal and state law, defendants' motion for summary judgment must be granted on any claim in which they can establish that there is no genuine issue of fact that plaintiff could have discovered the acts of fraud prior to June 24, 1969. When plaintiff knew or should have known sufficient facts to

recognize the alleged fraud, the statutory period begins and does not await the "leisurely discovery of the full details of the alleged scheme." Klein v. Bower, 421 F.2d 338 (2d Cir. 1970); see Sielcken-Schwarz v. American Factors Ltd., 265 N.Y. 239, 192 N.E. 307 (1934).

■■ In considering the claims, we realize that the question of whether reasonable diligence to discover facts was exercised often turns on the interpretation to be given to differently perceived events; such factors often make the granting of summary judgment inappropriate. Azalea Meats, Inc. v. Muscat, 386 F.2d 5 (5th Cir. 1967). However, in particularly clear cases summary judgment may be granted. Klein v. Shields & Co., *supra*. This is especially true where plaintiff's own version of the facts demonstrates without any doubt that he could have discovered the fraud within the time to bring the suit had he used reasonable diligence. Klein v. Bower, *supra*. Further, where plaintiff's own sworn admissions indicate that he was "suspicious generally" of defendants' activities in a particular matter as of a particular time, summary judgment may be appropriately granted for failure to bring an action within two years after such time because even "If these suspicions did not constitute actual discovery, they surely would have prompted a man of reasonable diligence to conduct further investigations." Klein v. H. N. Whitney, Goadby & Co., ·341 F.Supp. 699 (S.D.N.Y.1971).

■ Rickel stated twice in his deposition that he had become suspicious that something was wrong with Clinton shortly after the distributions had been suspended in 1963. In the 1964 private meeting with Levy, plaintiff, after complaining to Levy for wastefully expending money on fountains for tenants who were unworthy of such improvements while making no distributions to the partners, stated, according to the same deposition: "I'm going to look into this matter very clearly, very thoroughly. I

have a lot of money invested with you." At the hearing on this motion he stated that he "questioned the authenticity" and need for many of the expenses he saw in the financial statements he received from Levy beginning with the 1963 financial statement dated January 30, 1964. When one realizes that there were no significant events occurring in the period from 1965 to 1971 other than the payment of smaller than promised dividends, there is no explanation why the plaintiff could not have discovered the alleged fraud in 1964 rather than in 1971. We cannot escape the conclusion that there is no genuine issue regarding the fact that plaintiff had sufficient knowledge of certain information which would lead a reasonably diligent man to discover any fraud in the alleged misrepresentations and omissions in the prospectus, the partnership affairs or otherwise within the required time rather than wait for another seven years. However, there is no need to base summary judgment for defendants solely on the basis of plaintiff's lack of diligence in exploring a situation that a reasonably diligent man with plaintiff's suspicions would look into. There is sufficient additional information, relating to each of plaintiff's individual claims, of which plaintiff was aware or should have been aware demonstrating that as to each claim there is no genuine issue as to its being barred by the statute of limitations and not tolled by the fraudulent concealment doctrine.

Turning to the individual claims, we note that the only issue to be determined is whether Rickel discovered or could have discovered the fraud alleged in his specific claims within the prescribed period. We do not decide the merits of plaintiff's allegations concerning fraud, which have only for the purpose of this motion been admitted as true. However, in resolving the issue of notice under the statute of limitations, we were unable to avoid taking notice at the same time of the absence of a genuine issue of fact as to the merits.

## IV

The basis for our conclusion becomes more apparent from the following seriatim discussion of the specific claims.

### 1. *The False Advertising Claim.*

Rickel admitted in his deposition and at the hearing on this motion that he learned in 1962 of the inaccuracy of the statement in the New York Times that the union had invested $100,000 in Clinton. He did so by visiting Levy's office on a Sunday in 1962 and looking at the list of partners, whereupon, according to his testimony, he saw no unions on the list. Rickle states that he then visited the union offices and was told there that the union did not invest $100,000, that the article was not the truth but, rather, that it was a fraud. Further, the partners were informed at the 1963 general meeting, which Rickel attended that the New York Times article was inaccurate and that only two unions had invested in the property, one for $20,000 and the other for $5,000. Plaintiff had sufficient notice in 1962 and in 1963 to investigate the legitimacy of the advertising campaign of the Clinton syndicate.

### 2. *The Declining Neighborhood Claim.*

It is clear that by 1964 the deteriorating behavior of the tenants of Clinton Hill and the fact that Clinton Hill was surrounded by a deteriorating area causing higher than normal maintenance to security costs, as opposed to being surrounded by "traditionally fine" homes, were in plaintiff's knowledge. Plaintiff admits attending the 1963 meeting and receiving a letter of March 11, 1963, wherein the extraordinary expenditures caused to Clinton by missing equipment, refrigerators, ranges, broken windows, etc., were discussed. The financial statements of the subsequent years show similar expenditures. Rickel acknowledges receiving a report, dated November 3, 1964, which discussed the high vacancy rate and local violence and mentioned the resulting need for high

expenditure to keep tenants from moving out of Clinton Hill. It stated:

"Why are tenants moving? In addition to the normal reasons which should reflect about 10 vacancies a month instead of 40, there is an emergency reason: the violence in the vicinity this summer; the recent murder in a mansion next door to our property; the muggings in the area; and the tenants' fear of walking out at night and often even during the daytime. Many tenants with children have purchased homes they could not afford in order to get away from this situation."

Rickel admits twice in his deposition that at his 1964 private meeting with Levy he was told about the problems of tenants not paying rent, leaving "human dirt" and moving out. Plaintiff knew by 1964 that the neighborhood was declining.

### 3. The Sham Leaseback Claim.

■ Plaintiff had notice from page 7 of the prospectus that the lessee had the privilege of signing the lease without consent and without liability. It states:

"The lessee will have the privilege of assigning the lease without the partnership's consent and without further liability, except for obligations accrued to the date of assignment, if (i) the assignee assumes the lessee's obligations, (ii) there is no default in the payment of rent and additional rent under the lease at the time of assignment and (iii) there has been no failure by the lessee after notice from the lessor to remedy any other default. Accordingly, the partnership must look to the operation of the property for its assurance of receiving continuing income."

The rest of the sham leaseback claim alleges that Levy knowingly entered into an arrangement with the lessee to have the latter default within a short period of time after the creation of the lease without any hope of recovering the damages the default was sure to cause the syndicate. On January 14, 1963, all the partners received notice of default by the lessee which would require the partnership to take over the management of the property. At the general meeting held on March 11, 1963, the investors were advised that there was shabby behavior surrounding the default. They were told that the lessee had not only abandoned the lease obligation but that it had intended to continue to retain possession of the property, collect future rents and withhold them from Clinton to the extent that it was able to do so. Levy referred to the principals of Pierpont at this meeting as "crooks". The investors were further aware that the lessees were corporations without any assets. In a January 10, 1963 opinion letter to Levy which was read at the general meeting, Demoy & Morris, attorneys for the partnership, stated: "You have also informed us that to the best of your knowledge and information, the corporate tenant has no assets other than the lease aforementioned." Similarly, the November 3, 1964 report to the partners from Levy stated: "The former tenant is being sued. They offered about $7500 to settle. It is my guess that even if we win and obtain a judgment, we might find that we are confronted with dummy corporations." Plaintiff was placed on notice no later than 1964 that he should investigate the circumstances surrounding such a lease.

### 4. Attorneys' and Accountants' Claim.

■ On page 5 of the partnership agreement signed in the summer of 1960 by the limited partners, including Rickel, it is stated: "The General Partner in his absolute discretion has the power on behalf of the Partnership . . . (iii) to employ from time to time persons, firms or corporations for the operation and management of the Real Property, including . . . accountants and attorneys, on such terms and for

such compensation as he shall determine; . . . ." The agreement provides that he could do so regardless of the relationship between Levy and those he hired. The prospectus also made clear that limited partners were not to participate in the general conduct of the business and that Levy as general partner "has all the rights and powers of partners in a partnership without limited partners. . . ."

Rickel also had notice that Levy had not ascertained the accuracy of data obtained from Pierpont and used in the projections of future income. The prospectus stated that Spahr, Lacher & Berk's projections were "prepared on the basis of limited records made available by Pierpont Associates, Inc." and that "All of the statements, representations, statistics, data, estimates and projections herein are based upon the instruments referred to in the foregoing material and sources of information *believed* to be reliable." (P. 16). (Emphasis added.) When the later financial statements, meetings, personal communications with Richel and letters beginning in 1963 showed time and again that the projections in the prospectus were totally inaccurate and indicated that Pierpont was run by "crooks," a reasonably diligent man would have investigated the procedures used to determine the estimates. Rickel could have by exercise of reasonable diligence determined that Levy did not hire independent accountants, but hired accountants who served Levy's interests and not the partnership's if that happened to be a fact. Faced with events by 1964 that showed that Clinton had entered into a lease with a corporation which had no assets, and that the original accounting projections proved to be completely inaccurate, and with a partnership agreement that allowed Levy absolute discretion to hire accountants and attorneys regardless of their relationship to him, a reasonably diligent investor would investigate the relationship of Levy to these people. As we have already stated, Rickel testified that he questioned the authenticity of numerous items in the financial statements of the accountants he was receiving beginning with January 30, 1964. He had sufficient notice of the alleged fraud by 1964.

5. *The No Market Claim.*
Claim withdrawn.

6. *The Vanishing Tax Shelter.*

██ The prospectus itself stated on page 13 that "As the mortgage is reduced and the mortgage payments gradually increase, the amortization payable by the partnership increases as the allowable depreciations gradually decrease. As a consequence, the portion of basic contemplated distributions which is non-reportable for federal income tax purposes will steadily decline in each successive year of the partnership. A reproduction of the Spahr, Lacher & Berk projection appears on the preceding page." On the preceding page is a table, one column of which shows that the percent of estimated cash distributions not reportable would drop steadily from 100% in 1964 to 39% in 1970. Therefore, not only is it clear that plaintiff could have discovered any problem relating to the vanishing tax shelter as early as 1960, but it is also obvious that there was no failure to disclose as claimed.

7. *The Dilution Claim.*

██ This claim apparently refers to the fact, although far from being clearly spelled out by the plaintiff, that the capital value of the partnership was $4,236,000, while the purchase price of the property was only $3,500,000, the difference, approximately $900,000, in some way benefitting Levy or being used to pay the expenses of forming the partnership. The partnership agreement signed by Levy and the plaintiff in 1960 and made available to the investors, states that:

"WHEREAS, Sydney V. Levy has indicated his willingness to become the General Partner of the Partnership and to contribute to the Partner-

ship capital his interest as purchaser in the Purchase Agreement as other property of the agreed value of $3,500,000, with the proviso that the Partnership reimburse him for the monies advanced by him on account of the purchase price under the Purchase Agreement as aforementioned;" (p. 1).

It also states that:

"5. The capital of the Partnership shall be $4,236,000 consisting of (a) $3,886,000 in cash and (b) other property consisting of the purchaser's interest in the Purchase Agreement owned by Sydney V. Levy (who is to be reimbursed by the Partnership for the $350,000 advance on account of the purchase price thereunder, as aforementioned), at an agreed value of $350,000. Sydney V. Levy's contribution of such other property to the Partnership shall be accomplished, concurrently with the execution of this agreement, by his executing and delivering to the Partnership his assignment of the purchaser's interest in the Purchase Agreement." (p. 2).

It further states that: "The Partnership . . . (c) shall reimburse Sydney V. Levy forthwith for the $350,000 advanced by him on account of the purchase price under the Purchase Agreement." (¶ 19, p. 3). Pages 4 and 5 of the prospectus similarly place the investor on notice of the following:

(1) The capitalized value of the partnership was $4,236,000, composed of:

(i) $3,886,000 cash contributed by limited partners, and

(ii) $350,000, representing Levy's valuation of his purchase agreement.

(2) Of the $3,886,000 cash

(i) $3,500,000 representing the cash portion of the purchase price of the property, out of which Levy was to be reimbursed $350,000 for his additional deposit against the purchase price;

(ii) the difference between $3,500,-000 and $3,886,000 was to be used to "cover all expenses of the formation of the partnership, the offering and sale of limited partnership interests and the acquisition of the property."

All the partners, therefore, could with reasonable diligence have discovered at the time they signed the partnership agreement that any capitalized value above $3,500,000 was used to pay partnership formation expenses and to give Levy a $350,000 subordinate interest for which he did not pay cash.

## V

■ We therefore find that the plaintiff's claims are barred by the time limitations set forth in N.Y. CPLR § 213(9) and that summary judgment must be granted to the defendants dismissing the complaint. In doing so, we again emphasize the fact that we do not pass upon the credibility of any witness or otherwise consider the weight of evidence. We decide only that there is no genuine issue of a material fact with respect to the barring of the fraudulent claims. It is true that in the ordinary case the determination as to whether the action may proceed as a class action must be made before any examination of the merits. Here we are not making a determination on the merits. · This result will not affect the rights of other purported members of the class accruing before the commencement of this action, since the limitations period is tolled from that date until this decision becomes final. American Pipe & Construction Co. v. Utah, —— U.S. ——, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); Buford v. American Finance Co., 333 F. Supp. 1243 (N.D.Ga.1971); Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 460–461 (E.D.Pa. 1968).

So ordered.