**The GOVERNMENT OF INDIA and the Food Corporation of India, Plaintiffs,**

v.

**CARGILL, INC., Defendant.**

**No. 76 Civ. 1998 (CHT).**

United States District Court,
S. D. New York.

Jan. 16, 1978.

Delson & Gordon, New York City, for plaintiffs; Norman Moloshok, Alvin H. Meadow, Richard H. Silberberg, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant; Peter Gruenberger, Robert A. Weiner, Elise S. Solomon, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Plaintiffs in this action claim that they have been victimized to their extensive financial loss by the fraudulent conduct of the defendant which allegedly resulted in the plaintiffs receiving, over the course of many years, huge amounts of grain seriously deficient in quantity and quality from that specified in supply contracts entered into by the parties. The defendant is one of the major grain dealers in this nation and, as will be further explained, has been supplying grain to the plaintiffs under the aegis of the United States Government. Two motions are before the Court at this time. Plaintiffs have moved pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("Rules") to amend their complaint filed on May 3, 1976. The proposed amended complaint, filed November 15, 1976 amplifies and rearranges the various theories of liability but contains essentially the same claims, i. e., fraud, breach of contract, unjust enrichment and liability for excessive cargo transportation costs. However, the proposed amended complaint adds as a new cause of action one for derivative civil liability based on the inducement of willful breach of the United States Warehouse Act, 7 U.S.C. §§ 270 et seq., and of the United States Grain Standards Act, 7 U.S.C. §§ 85 and 87b.

For its part, defendant has protested the amendment of plaintiffs' complaint and has moved this Court for partial summary judgment on three grounds. First it contends that, despite the nomenclature, the plaintiffs' action is one for breach of contract only and that the New York statute of limitations governing such matters, N.Y.C. P.L.R. § 213(2) (McKinney 1972) bars all claims arising from alleged defects in cargo received by the plaintiffs more than four years before the filing of the complaint, i. e., prior to May 3, 1972. Alternatively, defendant asserts that even were this action to be dealt with as fraud, the applicable New York statutes of limitations, C.P. L.R. §§ 203(f) (McKinney 1972) and 213(8) (McKinney Supp. 1976–77), have run on all breaches which arose prior to May 3, 1970. Finally, defendant asks for partial summary judgment on any derivative claim for acts occurring before May 3, 1973, again on the theory that the statute of limitations has run.

In 1975 the press revealed, and the United States Congress began to investigate,[1] reports of flagrant corruption in the fulfillment of this nation's statutory program of foreign grain sales mandated pursuant to the Agricultural Trade Development and Assistance Act of 1954 as amended (the "Public Law 480 Program"). By the terms of this program, the United States Government, in support of our own agricultural industry and balance-of-trade and foreign-aid policies, finances in part and directs procedures for the weighing, inspection and shipment of huge quantities of grain from American suppliers to both underproducing and famine-struck nations.

The investigations into abuses revealed that fraudulent weight and grade certificates, later incorporated into documents of title received by grain buyers, were being issued at the behest of certain grain dealers by Government-licensed weighmasters and inspectors[2] at United States grain storage

---

1. United States General Accounting Office, *Report on Irregularities in the Marketing of Grain v.* (Joint Comm. Print, Senate Comm. on Agriculture & Forestry and House Comm. on Agriculture 1976) (*"GAO Report"*).

2. 7 U.S.C. § 252 provides for the licensing of grain inspectors as follows:

   The Secretary of Agriculture, or his designated representative, may upon presentation of satisfactory proof of competency, issue to any person a license to inspect, sample, or classify any agricultural product or products, stored or to be stored in a warehouse licensed under this chapter, according to condition, grade, or otherwise and to certificate the condition, grade, or other class thereof, or to weigh the same and certificate the weight thereof, or both to inspect, sample, or classify and weigh the same and to certificate the condition, grade, or other class and the weight thereof, upon condition that such person agree to comply with and abide by the terms of this chapter and of the rules and regulations prescribed hereunder so far as the same relate to him.

elevators and loading ports with the result that grain suppliers were being paid for a grade and quantity of grain less than that which they shipped. Although defendant is not under indictment for complicity in the scheme, it is apparently under investigation.[3]

The plaintiffs, the Government of India and The Food Corporation of India, the agency created by that nation to supervise the receipt and internal distribution of foreign food supplies, have been participants in this program, ordering and paying for upwards of ten million tons of grain pursuant to a series of contracts with this defendant since 1961. More than 700 shipments are involved. A sample contract between the parties, submitted to the Court by plaintiffs and not alleged to be unrepresentative by defendant, includes a clause providing that the weight and quality of the grain shipped is to be determined and certified at the loading port, *i. e.*, a United States port of embarkation, by a licensed weighmaster certified pursuant to 7 U.S.C. § 252 and the quality certified by an inspector licensed under the United States Grain Standards Act, 7 U.S.C. §§ 71 *et seq.* Likewise, the regulations promulgated by the Department of Agriculture pertaining to weight and grade of bulk wheat shipped under the Public Law 480 Program direct that "[t]he weight shall be determined at point of loading to vessel and the grade shall be determined by an inspector holding a license under the U. S. Grain Standards Act or the Agricultural Marketing Act at point of

---

7 U.S.C. § 270 provides penal sanctions for misconduct:

> Every person who shall forge, alter, counterfeit, simulate, or falsely represent, or shall without proper authority use, any license issued by the Secretary of Agriculture, or his designated representative, under this chapter, or who shall violate or fail to comply with any provision of section 250 of this title, or who shall issue or utter a false or fraudulent receipt or certificate, or change in any manner an original receipt or certificate subsequently to issuance by a licensee, or any person who, without lawful authority, shall convert to his own use, or use for purposes of securing a loan, or remove from a licensed warehouse contrary to this chapter or the regulations promulgated thereunder, any agricultural products stored or to be stored in such warehouse, and for which licensed receipts have been or are to be issued, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not more than $10,000, or double the value of the products involved if such double value exceeds $10,000, or imprisoned not more than ten years, or both, in the discretion of the court, and the owner of the agricultural products so converted, used, or removed may, in the discretion of the Secretary of Agriculture, be reimbursed for the value thereof out of any fine collected hereunder, by check drawn on the Treasury at the direction of the Secretary of Agriculture for the value of such products to the extent that such owner has not otherwise been reimbursed. Any person who shall draw with intent to deceive, a false sample of, or who shall willfully mutilate or falsely represent a sample drawn under this chapter, or who shall classify, grade, or weigh fraudulently, any agricultural products stored or to be stored under the provisions of this chapter, shall be deemed guilty of a misdemeanor, and upon conviction thereof fined not more than $500, or imprisoned for not more than six months, or both, in the discretion of the court.

The United States Grain Standards Act, 7 U.S.C. §§ 71 *et seq.*, fixes and establishes the official grade standards for grain, *id.* § 75; provides for licensing of official inspector/graders, *id.* § 79; proscribes, *inter alia*, the issuance of fraudulent and inaccurate certificates of grade, *id.* § 87b; and provides criminal penalties for violations. *Id.* § 87c.

3. Exhibit F to the Affidavit of Alvin H. Meadow, sworn to May 6, 1977 ("Meadow Affidavit"), includes an unsigned copy of an "affidavit" of Cornelius R. Heusel, identified as the First Assistant United States Attorney for the Eastern District of Louisiana and Special Assistant United States Attorney for the Middle District of Louisiana. This document, dated December 13, 1976, states at paragraph 3: "At the present time, a criminal investigation is continuing against Cargill, Inc. under the direction of the United States Attorneys for the Eastern and Middle Districts of Louisiana." The Meadow Affidavit identifies this document as one submitted in this action by the United States Government in its successful bid to quash deposition subpoenas served on officials of the United States Department of Agriculture on the ground that such discovery would interfere with the pending criminal investigation.

718

loading to vessel." 7 C.F.R. § 17, Appendix A(A)(6). It is alleged that the fraud practiced upon the plaintiffs centered upon this process of loading and inspection: defendant would load grain of lesser quantity, grade and quality than that specified in the relevant purchase contract, and the inspector would then falsely certify that the loaded grain was of the correct quality, grade and quantity.

In its motion to dismiss, defendant focuses not on this allegedly fraudulent loading process but upon the actions taken by the plaintiffs upon the grain's arrival in India. It is undisputed that the Government of India was aware of the apparent weight and quality discrepancies in each shipment of grain as it was off-loaded at various ports in India. Exhibit B to the Proposed Amended Complaint is a schedule of certain shortweight notations compiled by the plaintiffs specifying the vessel, the amount purportedly shipped and the amount weighed in at arrival.[4] Indeed, it is upon this document that plaintiffs base certain of their damage estimates. Defendant seizes on the plaintiffs' recognition and documentation of these disparities from 1961 on as absolutely fatal to plaintiffs' assertion that only after public revelations of the grain scandals in 1975 did they comprehend that they had a cause of action against defendant. Defendant asserts that plaintiffs, by failing to investigate the origin of these admittedly recorded differences, have permitted the statute of limitations to run on any pre-May 1970 fraud claims and have forfeited any right to an equitable tolling of the contract action statute of limitations and are thus barred from asserting breach of contract claims which arose prior to May 1973.

Plaintiffs, on the other hand, vigorously contend that a concrescence of circumstances, primarily the fraudulent activities of the defendant, confused plaintiffs as to the very fact of their loss, reasonably diverted them from investigating its origin and prevented earlier exposure of the fraud. In support of their position plaintiffs first assert that the various methods of weighment employed at Indian off-loading docks are of so primitive a nature compared to the highly sophisticated and uniform modes used in United States grain elevators that, despite the fact that they now believe Indian weighment methods to be as accurate as, if far slower than, this nation's, at the time they received the short shipments they attributed the discrepancies to their own deficiencies. Plaintiffs allege that defendant was aware and took advantage of India's perception of her weighing system as antiquated and perhaps inadequate. Second, plaintiffs assert that since statute, custom and usage of trade justified reliance on the probity of licensed American weighmasters and inspectors, the weight and quality certificates covering each shipment were taken as conclusive, leaving plaintiffs without any cause to suspect the defendant's alleged defalcations.[5] Finally, plaintiffs assert that famine conditions in India were occasionally such that meticulous weighing and quality control were sacrificed in order to distribute food quickly and that defendant knew of such conditions and exploited the exigencies of the situation to its advantage.

Under these circumstances, plaintiffs argue that defendant should be equitably estopped from asserting any statute of limitations which may have run in its favor; alternatively, plaintiffs contend that their suit bottoms in fraud and is timely under the statute of limitations for that tort.

4. Exhibit B enumerates over 200 such entries in which the recorded weight of grain received deviates from the amount purportedly shipped from as little as 0.858 metric tons to as much as 2,631.349 metric tons. By the Court's rough calculation, the average shortage represented by these records is approximately 230–240 metric tons per shipment.

5. Since 1968, 7 U.S.C. § 79(d) has provided that [o]fficial certificates setting out the results of official inspection issued and not canceled under this chapter shall be received by all officers and all courts of the United States as prima facie evidence of the truth of the facts stated therein.

*Fraud and Contract Claims*

■ A motion for summary judgment under Rule 12(c) is to be treated exactly like one under Rule 56, *see Carter v. Stanton,* 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); 2A *Moore's Federal Practice* ¶ 12.15, at 2348–49; thus, the motion cannot be granted if there is any genuine issue of material fact upon which reasonable men might reach different conclusions. *Empire Electronics Co. v. United States,* 311 F.2d 175 (2d Cir. 1962). Furthermore, "[s]ummary judgment is apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions." 6 *Moore's Federal Practice* ¶ 56.17[27], at 56–866; *see Teledyne Industries, Inc. v. Eon Corp.,* 373 F.Supp. 191 (S.D.N.Y.1974), *aff'd,* 546 F.2d 495 (2d Cir. 1976) (per curiam). The Court finds Professor Moore's description to be particularly appropriate here. The defendant argues, however, that the Court can avoid a confrontation with the complex mass of documents presented on this motion by treating the case as a basic action for breach of contract. Such a simple path is not available for two reasons.

■ First, the contracts themselves, as well as the contract cause of action, may be vitiated by the fraud surrounding the initiation and implementation of the contracts. It is well established by the applicable New York law [6] that a misrepresented intention to perform a contract constitutes actionable fraud. *Channel Master Corp. v. Aluminum Limited Sales, Inc.,* 4 N.Y.2d 403, 176 N.Y. S.2d 259, 151 N.E.2d 833 (1958); *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). These fraudulent misrepresentations may be contained in the words of the contract itself. *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572 (2d Cir. 1969); *see Restatement, Contracts* § 473 (1932); *Restatement Second, Torts* § 530, comment c (1977). Allegations of such misrepresentations are present in this case: in addition to alleging fraud in the second cause of action in their original complaint, plaintiffs alleged in their original contract claim that defendant "had actual or constructive knowledge that the [nonconforming shipments] were of lesser value than specified in the respective contracts." Complaint ¶ 9. The gravamen of the Proposed Amended Complaint is to the same effect, charging that the contractual relationship between the parties was tainted by defendant's fraudulent intent not to ship conforming goods and by the scheme utilized by defendant, the inspectors and others to realize that end.

Second, bare reliance on a contract theory will not avail the defendant because the facts and circumstances lying at the heart of the fraud alleged in this case may also give rise to the application of the doctrine of equitable estoppel and thus bar a statute-of-limitations defense on the contract claim. This doctrine is grounded in the elements of discovery and due diligence, likewise the touchstones of the New York statute of limitations for fraud actions. Thus, the inquiry on either subject is substantially the same, turning as it does on questions of a plaintiff's knowledge, actual or imputed, in the face of a defendant's affirmative acts of fraudulent concealment.

The doctrine of equitable estoppel in New York derives directly from *Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959), the holding of which is expressed in the simple maxim that "no man may take advantage of his own wrong." *Id.* at 234, 79 S.Ct. at 762. The New York Court of Appeals forthrightly adopted *Glus* in *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966). There the defendant bookkeeper had for years been siphoning funds from plaintiff's petty cash account unbeknownst to the plaintiff. The court held that the defendant should be estopped from asserting the statute of limitations as a defense "where it is the defendant's af-

---

**6.** Because the parties are before the Court on diversity, state law governs the timeliness of all claims asserted. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Furthermore, the parties specified in their contracts that New York law would apply to all disputes thereunder.

firmative wrongdoing—a carefully concealed crime here—which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Id.* at 128, 272 N.Y.S.2d at 340, 219 N.E.2d at 171.

And while the equitable estoppel doctrine has been used somewhat sparingly in New York, *see Saylor v. Lindsley,* 391 F.2d 965, 970 (2d Cir. 1968) (New York law "less liberal" than federal law), it has had enough vitality to permit leave to amend to allege sufficient facts to support its assertion, *Saylor v. Lindsley,* 302 F.Supp. 1174, 1187 (S.D.N.Y.1969) (on remand); to "present a triable issue [of fact]," *Lowell Wiper Supply Co. v. Helen Shop, Inc.,* 235 F.Supp. 640, 646 (S.D.N.Y.1964); to reverse dismissal of a time-barred cause of action for breach of fiduciary duty, *Erbe v. Lincoln Rochester Trust Co.,* 13 App.Div.2d 211, 214 N.Y.S.2d 849 (1st Dep't 1961), *appeal dismissed,* 11 N.Y.2d 754, 226 N.Y.S.2d 692, 191 N.E.2d 629 (1962); to bar assertion of the statute of limitations, *Safrin v. Friedman,* 27 Misc.2d 687, 96 N.Y.S.2d 627 (Sup. Ct.1950). *See generally* 1 Weinstein, Korn and Miller, *New York Civil Practice* ¶ 201.-13, at 2–22 to –29 (rev. ed. 1975).

■■ Parallel principles of justice apply in New York to the limitation of an action for fraud. The mandates of both N.Y.C.P. L.R. § 203(f) (McKinney 1972) and § 213(8) (McKinney Supp. 1976–77) govern the time limitations for institution of claims based on that tort, and the two have been construed together to provide for alternate limitations where discovery of fraud is delayed: the plaintiff has two years from discovery or six years from accrual, whichever is longer. *Klein v. Shields & Co.,* 470 F.2d 1344, 1346 (2d Cir. 1972); *Hoff Research & Dev. Lab., Inc. v. Philippine Nat'l Bank,* 426 F.2d 1023 (2d Cir. 1970). The language in both statutes instructs that a fraud concealed from the plaintiff will not cease to be actionable until a period after the plaintiff "with reasonable diligence" could have discovered "the facts."[7] The time bar cannot be avoided in New York where the facts of the case are such as to suggest "to a person of ordinary intelligence the probability that he has been defrauded." *Sielcken-Schwarz v. American Factors, Ltd.,* 265 N.Y. 239, 245–46, 192 N.E. 307, 309 (1934). At that point the duty of inquiry triggers the running of the statute. "[W]hen facts are known from which the inference of fraud flows, there is a discovery of the facts constituting the fraud within the terms of the statute." *Ectore Realty Co., Inc. v. Manufacturers Trust Co.,* 250 App.Div. 314, 318, 294 N.Y.S. 96, 100 (1937); *see Klein v. Bower,* 421 F.2d 338 (2d Cir. 1970); *Rickel v. Levy,* 370 F.Supp. 751 (E.D.N.Y.1974).

■ Given the type of factual inquiry which seems to be required by the applicable New York law, summary judgment is not an appropriate method by which to decide the statute-of-limitations questions presented by this case. As the court of appeals for this circuit has stated in reversing the granting of summary judgment in a case which raised similarly complex issues of fraud and limitation, the allegations here "bristle with genuine issues as to the material facts." *Friedman v. Meyers,* 482 F.2d 435, 439 (2d Cir. 1973). The court went on to admonish:

> We have repeatedly stated that summary judgment is particularly inappropriate where, as here, it is sought on the basis of "the inferences which the parties seek to

---

7. N.Y.C.P.L.R. § 203(f) provides:

Time computed from actual or imputed discovery of facts. Except as provided in article 2 of the uniform commercial code, where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.

N.Y.C.P.L.R. § 213 states:

The following actions must be commenced within six years:

. . . . .

8. an action based upon fraud; the time within which the action must be commenced shall be computed from the time the plaintiff or the person under whom he claims discovered the fraud, or could with reasonable diligence have discovered it.

have drawn [as to] questions of motive, intent and subjective feelings and reactions," *Cali v. Eastern Airlines, Inc.* [422 F.2d 65, 71] quoting *Empire Electronics Co. v. United States,* 311 F.2d 175, 180 (2d Cir. 1962).

*Id.*

Only a few basic facts are not at issue in this case. It is undisputed in the reams of paper submitted to this Court that the plaintiffs knew *something* was amiss when they compared their off-load weighment figures and grade evaluations to the counterparts certified at American loading ports. It is likewise undisputed that the fact of industry-wide abuses in the Public Law 480 Program and other foreign grain shipment programs—including falsification of weight and grain certificates—surfaced only in 1975. *GAO Report, supra* note 1, at v. Beyond these items all facts and inferences to be drawn therefrom are hotly contested. From the lengthy depositions of officials of plaintiff The Food Corporation of India (and from the dozens of exhibits appended thereto) both parties have abstracted comments which each asserts are conclusive in its favor. For example, the following colloquy is representative of many others which bear on whether plaintiffs' suspicions were or should have been aroused as to defendant's alleged wrongdoing:

Q You knew how much you were short shortly after the time it was received in India?

A That's right.

Q Isn't that all you cared about, that you were short and you shouldn't be paying for more than you received, isn't that right?

A Whatever we were receiving short we were seeing that this was short and we were looking for that maybe due to the carriers, because the supplier has loaded it and that certificate says they are correctly loaded *and the certificate on which we were relying that they were true, so we were taking that it was the carrier to whom we would have to look.*

Deposition of Sarmukh Singh 133 (as corrected) (emphasis added). Plaintiffs cite this testimony as indicative of their "good faith reliance upon the weight certificates at the loading port." Meadow Affidavit, *supra* note 3, ¶ 16. Defendant characterizes the very same testimony as patently absurd, asserting that it stands only for the proposition that plaintiffs knew receipts were short. Affidavit of Peter Gruenberger, sworn to May 27, 1977, ¶ 17. Defendant asserts that during the period plaintiffs received nonconforming grain they complained to the United States Government that this very defendant had "not fulfilled its contractual obligations," Gruenberger Affidavit, sworn to January 31, 1977, ¶ 6, and thus their claims of bafflement are patently sham. Plaintiffs on the other hand, while acknowledging that written weight reports were made to the Assistant Agricultural Attache to the United States Government Embassy at New Delhi pursuant to the mandate of the Public Law 480 Program, note that although discrepancies were enumerated, the reports were footnoted with comments like "[t]he decrease in weight is mainly due to different methods of weight at the loading and discharging ports. All grain was unloaded." Meadow Affidavit, *supra* note 3, ¶ 9. Defendant contends that the very terms of the contract between the parties refute plaintiffs' assertion that they were *justifiably* deluded since Paragraph 11 of their standard contractual form contains a clause providing that "Buyer [plaintiffs] shall have the option to require additional independent inspection of the weight and condition of grain by a commercial inspection firm at his own expense or by Government of India agency." Proposed Amended Complaint, Exhibit A. Plaintiffs respond that the cost of such independent inspection would have been prohibitive, Meadow Affidavit, *supra* note 3, ¶¶ 37, 38, and that there was evidence adduced at the congressional hearings on grain fraud that such third-party inspection would not have uncovered the kind of fraud practiced at most grain elevators. *Id.* ¶ 37.

Similar examples demonstrate that defendant relies, at bottom, on plaintiffs' immediate knowledge of injury-in-fact, while

**722**

plaintiffs assert that defendant's fraudulent conspiracy hid the fact of legal injury. Viewing the inferences to be drawn from the underlying facts in this matter in the light most favorable to the party opposing summary judgment, *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), this Court cannot say as a matter of law that, at the time plaintiffs off-loaded and tallied grain which did not conform in weight or grade to perhaps discredited certificates bearing the imprimatur of agents of the United States Government, the plaintiffs were on such notice of defendant's possible defalcations as to merit application of the various statutes of limitations discussed above.

### Statutory Claim

■ Defendant has also moved the Court for summary judgment as to activities prior to May 1973 on any claim plaintiffs seek to make by inferring a civil cause of action based on defendant's alleged complicity in violations of the United States Warehouse Act, 7 U.S.C. § 270, and the United States Grain Standards Act, 7 U.S.C. §§ 85, 87b. These are penal statutes providing, *inter alia*, that one who issues or suborns the issuance of false weight and grade certificates be fined or imprisoned or both. Defendant is not, for now, contesting the validity of such a cause of action, Def. Rep. Mem. 8 n. **; it reserves the right to raise at a later date the constraints of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which guide the inference of similar claims. What defendant does argue, however, is that because these statutes contain no limitation period for any civil liability the Court must borrow a New York limitations period after examining the nature of the claim and analogizing it to forum law. *Moviecolor Limited v. Eastman Kodak Co.*, 288 F.2d 80, 83 (2d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961). This procedure, continues defendant, militates for a finding that the proposed derivative civil liability is governed by N.Y.C.P.L.R. § 214(2), which limits actions to recover on a liability created by a statute to a period of three years. Defendant concludes that all such claims which arose prior to May 1973—if ever valid—are now barred by the passage of time.

Plaintiffs do not address this aspect of the problem. They assert that having stated a federally created cause of action they are within the purview of the federal "equitable tolling doctrine" derived from *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875). In that case and its progeny the theory was developed that a claim cognizable under direct federal jurisdiction will be tolled as long as the operative facts are concealed by the wrongdoers. *Saylor v. Lindsley*, 391 F.2d 965 (2d Cir. 1968); *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); *Moviecolor Limited v. Eastman Kodak Co., supra*. In view of this Court's conclusion on the issues relevant to the contract and fraud claims—knowledge, intent, fraudulent concealment and general equity—defendant's motion for partial summary judgment on this cause of action is denied for want of proof that no material issue of fact exists for trial.

### Amendment of Complaint

■ The plaintiffs have moved for leave to file their Revised Proposed Amended Complaint under Rule 15(a), the operative language of which instructs the court that "leave shall be freely given when justice so requires." The Supreme Court has stated that "[i]f the underlying facts or circumstances relied upon by a plaintiff *may* be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (emphasis added). Defendant has made no showing that the amended complaint, which in no material way alters the basic charges leveled against it, will prejudice its defense. *United States v. Hougham*, 364 U.S. 210, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960); *Middle Atlantic Utilities Co. v. S. M. W. Development Corp.*, 392 F.2d 380 (2d Cir. 1968). The only new cause of action pleaded is the civil liability claim sought to be derived from federal statute, and that claim should come as no surprise to defendant since the initial complaint alleged a fraudulent conspiracy on the part of defendant to cause officially

licensed weighers and inspectors to kite the quantity and quality of grain reported on shipment certificates. Complaint ¶ 18. As the court stated in *Matarazzo v. Friendly Ice Cream Corp.,* 70 F.R.D. 556, 559 (E.D.N.Y.1976), "Even though it is predicated upon a different theory, an amendment should be permitted in the absence of the injection of any new issues requiring new and extensive preparation detrimental to the speedy resolution of the case and prejudicial to the defendant."

For the foregoing reasons, defendant's motions for partial summary judgment on all contract, fraud and statutorily derived causes of action arising, respectively, prior to May 1972, May 1970 and May 1973 are denied; plaintiffs' Rule 15(a) motion for leave to amend their complaint is granted and the plaintiffs are directed to file their Revised Proposed Amended Complaint, a copy of which is appended to their Notice of Motion filed November 15, 1976.

So ordered.